# United States Court of Appeals
## For the First Circuit

No. 21-1276

GABIEL LOZADA-MANZANO; CESAR LOZADA; BELKIS MANZANO,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]
[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Kayatta and Lynch, Circuit Judges,
and Woodlock,* District Judge.

Allan A. Rivera Fernandez for appellants.
David C. Bornstein, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

July 20, 2023

* Of the District of Massachusetts, sitting by
designation.

**Lynch**, **Circuit Judge**. The plaintiff-appellant here, Gabiel Lozada-Manzano, was indicted in 2013 by a federal grand jury on charges of carjacking and use of a firearm during a crime of violence arising from a 2012 home invasion in Carolina, Puerto Rico. These federal criminal charges were eventually dismissed on the prosecution's motion after evidence surfaced that suggested Lozada-Manzano had been in police custody at the time of the incident.

Lozada-Manzano and his parents then brought this civil action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2680(h), raising, inter alia, a claim for malicious prosecution under Puerto Rico law. The district court granted summary judgment in favor of the government, reasoning that the record does not contain evidence from which a reasonable factfinder could conclude that any relevant federal actor pursued the indictment either without probable cause or with malice. See Lozada-Manzano v. United States, No. 15-cv-02601, 2021 WL 1063199, at *15 (D.P.R. Mar. 19, 2021).

We agree that Lozada-Manzano has not raised a triable issue as to malice under Puerto Rico law as required by the FTCA, and so cannot prevail on his malicious prosecution claim. We do not analyze whether the indictment was supported by probable cause. We also affirm the district court's decisions on several other points raised by Lozada-Manzano.

- 2 -

A.    **The 2012 Home Invasion and Car Theft**

On the afternoon of July 22, 2012, at least two individuals[1] with obscured faces broke into the home of Alejandro Caloca-Calbo[2] in Carolina, Puerto Rico; bound and gagged Mr. Caloca-Calbo at gunpoint; pointed guns at his arriving family; and raided the house for valuables before departing in a stolen car.

The home invasion began at approximately 2:45 P.M.,[3] when Mr. Caloca-Calbo saw a taxi pull up to his front gate and drop off multiple passengers.  One of the intruders pointed a firearm at Mr. Caloca-Calbo and ordered him to open the front gate.  Mr. Caloca-Calbo did what he was told.  The intruders entered the house and bound and gagged Mr. Caloca-Calbo while threatening him with the firearm.  One intruder continued to hold Mr. Caloca-Calbo at gunpoint, and another began searching for valuables.

---

[1]    The majority of the witness statements in the record refer to two intruders, but at least one victim testified in a later deposition that there were three.

[2]    Both the record and the parties' briefing are inconsistent in their spelling and hyphenation of various individuals' names, including Mr. Caloca-Calbo's.  We hyphenate surnames and otherwise follow the district court's spellings.

[3]    Mr. Caloca-Calbo told investigators that the incident began at approximately 2:45 P.M.  More than seven years after the home invasion, in November 2019, he stated in a deposition that the incident began "somewhere between 2:45 and 3:15."

At some point, Mr. Caloca-Calbo's adult daughter, Sadie Caloca-Marrero, and his three grandchildren -- Jadie, Alondra, and Andrick -- arrived and interrupted the home invasion. Mr. Caloca-Calbo, Ms. Caloca-Marrero, and her three children appear to be the only eyewitnesses to provide statements related to the home invasion. They recounted, at various times and with varying degrees of detail, the following description of the home invasion to officers of the Puerto Rico Police Department during the criminal investigation preceding Lozada-Manzano's federal indictment in 2013.

Ten-year-old Jadie ran into the house and stumbled upon the intruders, seeing her grandfather gagged and restrained on the floor. A heavyset intruder pointed his gun at Jadie's head. The intruders then moved outside and approached Ms. Caloca-Marrero and Jadie's siblings -- twelve-year-old Alondra and fourteen-year-old Andrick. One of the intruders pointed a gun at Ms. Caloca-Marrero and demanded the keys to her 1998 Mitsubishi Montero. She surrendered the keys.

As the intruders approached the Montero, Andrick went to the car and began to search for his cellphone. The intruders entered the Montero and ordered Andrick out of the vehicle. Retrieving his cellphone, Andrick complied. The intruders drove off the property, and Andrick called 911.

The Governing Board of 911 Service logged and recorded

Andrick's call. The report generated by the 911 Service ("the 911 report") states that Andrick's call was received at 4:35 P.M. A transcript of the recorded call shows that Andrick told the dispatcher at 4:39 P.M. that the robbery "just now happened," and that his mother's car had just been stolen in the robbery.

Shortly thereafter, police found the Montero abandoned outside a nearby shopping center.

**B. The Arrest of Lozada-Manzano in Isla Verde by the Puerto Rico Police**

Around 3:20 P.M. that day, Lozada-Manzano was arrested in Isla Verde, Puerto Rico. He had been the rear passenger in a light gray Toyota Corolla being driven recklessly down the freeway. A Puerto Rico Police officer initiated a traffic stop, but the driver disregarded the stop instructions and sped off. A chase ensued, and the driver crashed the Corolla.

The Corolla's driver and passenger, reported by an FBI agent during grand jury testimony to have been carrying firearms, then emerged from the vehicle, ran away, and were never apprehended. The vehicle's third occupant, Lozada-Manzano, attempted to run but was immediately captured and arrested by police near the site of the crash. The handwritten notes of the arresting officer indicate that Lozada-Manzano was arrested at

3:20 P.M.  Police searched the Corolla and found a firearm on the right front floor of the vehicle.[4]

**C.    The Identifications of Lozada-Manzano by Eyewitnesses to the Home Invasion**

During the Puerto Rico Police investigation of the home invasion, Mr. Caloca-Calbo's grandchildren, Jadie, Alondra, and Andrick, were asked to participate in photo identification procedures.  The children's identifications are the only ones contained in the record.  Jadie, Andrick, and Alondra each separately took part in the same kind of identification procedure -- review of a photo array -- conducted in early 2013 by law enforcement agents.  The children's mother, Ms. Caloca-Marrero, was present for each procedure and agreed in her deposition in this case that the children made the identifications "freely and voluntar[ily]."  Each child viewed a photo array of the same nine headshots, configured in a three-by-three array, depicting men from the shoulders up.  The headshots were differently ordered for each of the three children's identifications.  The two adults -- Mr. Caloca-Calbo and Ms. Caloca-Marrero -- did not participate in any formal identification procedures.

---

[4]    The prosecutor for the Commonwealth of Puerto Rico declined to charge Lozada-Manzano in connection with the Isla Verde crash and the firearm recovered in the Corolla "due to not having the elements of the offense."

- 6 -

In February 2013, Jadie, at that point eleven years old, reviewed the photo array and identified the photo depicting Lozada-Manzano as resembling the intruder who had pointed a gun at her head.

About two weeks later, Andrick, then fifteen years old, also selected the photo depicting Lozada-Manzano as resembling one of the intruders.

About two months later, in April 2013, Alondra, then thirteen years old, also selected the photo depicting Lozada-Manzano as resembling one of the robbers.

D.    **The Investigation of the Home Invasion**

By February of 2013, the investigation of the home invasion had been taken up by Puerto Rico Police officers assigned to assist the FBI in investigating carjackings and related crimes as part of a federal task force.  Officers Jose Rivera-Rivera and Lester Perez-Difre led the initial stages of this aspect of the investigation.

On or about February 20, 2013, Officer Perez-Difre received a certified copy of the recording of Andrick's 911 call, which reported the time of that call as 4:35 P.M., along with timestamped dispatch records from the Governing Board of 911 Service.

On March 21, 2013, Officer Perez-Difre authored a supplement to the initial Puerto Rico Police Department incident

report in which he stated: "The investigation reveals after the interview of injured parties in this case that the time [illegible] was from 2:45 pm to 3:00 pm approximately." Other than the two initial witness identifications, which had pointed to Lozada-Manzano, the record does not contain any witness interviews taken before Officer Perez-Difre authored this supplement, but it does include later interviews that are consistent with the supplement. On April 8, 2013, Officers Perez-Difre and Rivera-Rivera interviewed Mr. Caloca-Calbo, Ms. Caloca-Marerro, Jadie, Andrick, and Alondra and took their statements. Mr. Caloca-Calbo stated that the home invasion began at approximately 2:45 P.M. Ms. Caloca-Marerro and her children each stated that they interrupted the robbery at approximately 3:00 P.M. Mr. Caloca-Calbo, Ms. Caloca-Marerro, and Alondra referred to two intruders. The notes do not report that Andrick and Jadie specified the number of intruders.

### E. The Federal Criminal Indictment of Lozada-Manzano

In April or May of 2013, the FBI referred the case to the United States Attorney's office for prosecution. Assistant United States Attorney ("AUSA") Amanda Soto-Ortega was assigned to prosecute the case. In an affidavit she later filed in support of summary judgment for the government in this civil case, she stated that she learned from "the case investigation and the information relied [on] by [her] for prosecuting this case" that Lozada-Manzano

was arrested after the home invasion concluded. She understood him to be one of the intruders who participated in the home invasion and carjacking.

AUSA Soto-Ortega presented the case to a federal grand jury on May 22, 2013. It was FBI Special Agent Fernando Oliva who was called to testify about the FBI's investigation of the home invasion, not investigating Officers Perez-Difre or Rivera-Rivera. Agent Oliva told the grand jury that Mr. Caloca-Calbo was the victim of a home invasion by three armed intruders, and that those intruders had stolen Ms. Caloca-Marrero's car. Agent Oliva then informed the grand jury that shortly after the carjacking, Lozada-Manzano was arrested following a traffic-stop-turned-police-chase of a car containing Lozada-Manzano and two armed men near Mr. Caloca-Calbo's home. Agent Oliva told the grand jury that all three of the Caloca grandchildren identified Lozada-Manzano as one of the intruders from a photospread. Agent Oliva did not describe the timestamp on the 911 report or compare that timestamp to the time of Lozada-Manzano's arrest, and he did not testify that Mr. Caloca-Calbo, Ms. Caloca-Marrero, and Alondra had stated that there were only two intruders. Because Agent Oliva was never deposed during discovery in this case, nothing in the record reveals which particular documents or statements he relied on in presenting his testimony outlining the sequence of events.

That same day, the grand jury indicted Lozada-Manzano on charges of carjacking and aiding and abetting that offense, see 18 U.S.C. § 2119(1); id. § 2, and use of a firearm during and in relation to a crime of violence and aiding and abetting that offense, see id. § 924(c)(1)(A)(ii); id. § 2. On May 31, 2013, Lozada-Manzano voluntarily surrendered and made his initial appearance before a magistrate judge. He was ordered detained pending an arraignment and detention hearing.

The arraignment and detention hearing were held on June 5, 2013. After Lozada-Manzano pleaded not guilty, the parties addressed bail. AUSA Soto-Ortega described the allegations against Lozada-Manzano, including that he had been one of three home invaders who were later involved in the Isla Verde car chase and crash and was identified by "three minors" in photo arrays. Defense counsel denied the allegations and represented that Lozada-Manzano had a "solid alibi" for the day of the home invasion because he "was with his family at all times" and "did not leave the area where [they] were." The magistrate judge denied bail.

Over nine months later, at a suppression hearing on March 13, 2014, Lozada-Manzano's defense counsel presented the magistrate judge with the notes listing the time of Lozada-Manzano's arrest as 3:20 P.M. and the 911 report regarding the home invasion timestamped at 4:35 P.M. Counsel argued that if Lozada-Manzano was in custody at 3:20 P.M., then he could not have

been a participant in the home invasion and carjacking immediately prior to 4:35 P.M. AUSA Soto-Ortega responded that the government believed the timing presented a jury issue, given the witnesses' statements which all placed the home invasion as occurring around 2:45 or 3:00 P.M. Based on the timeline information, the magistrate judge granted Lozada-Manzano bail.

Lozada-Manzano, through counsel, moved to dismiss the indictment on March 18, 2014. Two weeks later, on March 31, 2014, he filed a formal notice of alibi defense. The government sought and was granted an extension of time to respond to the motion to dismiss.

On May 6, 2014, the government filed a motion to dismiss the indictment without prejudice "in the best interest of justice." The district court granted the government's motion and dismissed the indictment the next day.

**F.   Lozada-Manzano's Civil Tort Action, Which Is the Subject of This Appeal**

On October 21, 2015, Lozada-Manzano, together with his parents and now represented by tort claims counsel, brought the lawsuit that is the subject of this appeal. Lozada-Manzano's complaint, while organized in a meandering manner, asserts a malicious prosecution claim, as defined by Puerto Rico law, against the United States pursuant to the FTCA. The complaint identifies a single defendant, the United States, and asserts two "Count[s]":

Count I for "Malicious Prosecution Under Puerto Rico Law" and Count II for "Negligence [U]nder the Federal Tort[] Claims Act." We consider these two "Count[s]" in the context of the complaint as a whole. Cf. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). The complaint asserts throughout that "[t]he United States of America is liable . . . for the acts and omissions of its employees and agents . . . under the law of the place where said acts and omissions occurred, to wit, under the Puerto Rico general tort statute there would be claims for . . . malicious prosecution." As the district court and the parties themselves have, we read the complaint to assert a claim for malicious prosecution pursuant to the FTCA.

In an undifferentiated way, the complaint appears also to assert 1) constitutional tort claims under the FTCA; 2) negligent supervision and investigation claims under the FTCA; and 3) other tort claims under Puerto Rico law. The complaint does not name any individual officer as a defendant.

On September 21, 2016, the government moved to dismiss the complaint for lack of jurisdiction and failure to state a claim. While that motion was pending, on October 25, 2016, Lozada-Manzano moved for leave to amend the complaint. Although his proposed amended complaint contained Officers Perez-Difre's and Rivera-Rivera's names and detailed their actions, it still listed only the United States as a defendant. On August 4, 2017,

- 12 -

the motion for leave to amend was denied, and various tort claims were dismissed on the grounds that the constitutional tort claims were not cognizable under the FTCA and that, because Lozada-Manzano's negligence claims were factually indistinguishable from his constitutional tort claims, the negligence claims were barred as well. Partial judgment was entered. Only Lozada-Manzano's FTCA malicious prosecution claim survived the partial judgment of dismissal.

A period of pretrial discovery followed. Before that round of discovery originally closed in 2016 under the original case management schedule, tort claims counsel for Lozada-Manzano apparently did not undertake to depose the key witnesses. Nearly three years after that discovery period had closed, the parties sought leave to conduct further discovery to depose the victim witnesses of the home invasion. A different judge to whom the case had by then been reassigned granted leave to conduct those depositions but warned that discovery would be extended no further.

Despite that warning, Lozada-Manzano later sought leave to reopen discovery again to depose Agent Oliva, Officer Perez-Difre, and AUSA Soto-Ortega. The court denied the motion to reopen discovery based on a request made so long after discovery had been scheduled to end.

The parties cross-moved for summary judgment in 2020. The court granted summary judgment on March 19, 2021, to the

government.  See Lozada-Manzano, 2021 WL 1063199, at *15.  The court held that no reasonable factfinder on the record presented could conclude that federal agents acted with malice and without probable cause because 1) three eyewitnesses identified Lozada-Manzano as one of the home invaders in photo identification procedures that were not unduly suggestive, and 2) the record did not demonstrate that federal agents either a) were aware that the home invasion occurred after Lozada-Manzano's arrest or b) withheld evidence of that fact from the grand jury.  See id. at *11-15.  A judgment was entered "dismissing with prejudice th[e] action in its entirety."  (Capitalization and emphasis omitted.)

Lozada-Manzano challenges on appeal the grant of summary judgment for the government, as well as the earlier denial of leave to amend and dismissal of his other claims.[5]

## II.

### A.

We review de novo the district court's decision to grant summary judgment.  Díaz-Nieves v. United States, 858 F.3d 678, 683 (1st Cir. 2017).  Summary judgment is appropriate only if, after viewing the record in the light most favorable to the nonmoving

---

[5]    To the extent that Lozada-Manzano purports to appeal the district court's denial of his own summary judgment motion, we lack jurisdiction to consider that interlocutory ruling.  See, e.g., Bais Yaakov of Spring Valley v. ACT, Inc., 12 F.4th 81, 86 (1st Cir. 2021).

party, we can discern no genuine issue of material fact that would preclude judgment as a matter of law.  McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017).

Through the FTCA, Congress waived sovereign immunity as to certain actions against the United States for damages "caused by the negligent or wrongful act or omission of [an] employee of the Government while acting within the scope of his office or employment," to the same extent that a private individual would be liable for such damages.  28 U.S.C. § 1346(b)(1).  "In substance, the FTCA adopts respondeat superior liability for the United States . . . ."  Solis-Alarcón v. United States, 662 F.3d 577, 583 (1st Cir. 2011).

Although the FTCA does not waive sovereign immunity as to intentional torts generally, 28 U.S.C. § 2680(h) expressly makes malicious prosecution claims actionable based on "acts or omissions of investigative or law enforcement officers of the United States Government."  See Díaz-Nieves, 858 F.3d at 683.  The statute defines "investigative or law enforcement officer" to mean "any officer . . . who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  Federal prosecutors do not fall within this definition, and so their actions cannot provide the basis for malicious prosecution actions under the FTCA.  See, e.g., Yacubian v. United States, 750 F.3d 100, 108 (1st Cir. 2014).

- 15 -

As argued by Lozada-Manzano and on the basis of the summary judgment record before us, the critical "investigative or law enforcement officer," 28 U.S.C. § 2680(h), for FTCA purposes is Agent Oliva, whose testimony before the grand jury provided the basis for the initiation of the prosecution through the indictment of Lozada-Manzano.

We apply "the law of the place where the [alleged tortious conduct] occurred" -- in this case, the law of the Commonwealth of Puerto Rico. 28 U.S.C. § 1346(b)(1); see, e.g., FDIC v. Meyer, 510 U.S. 471, 478 (1994); Díaz-Nieves, 858 F.3d at 683. To prove a malicious prosecution claim under Puerto Rico law, plaintiffs must prove four elements: "1) that a criminal action was initiated or instigated by the defendants; 2) that the criminal action terminated in favor of [the] plaintiff[s]; 3) that [the] defendants acted with malice and without probable cause; and 4) that [the] plaintiff[s] suffered damages." Gonzalez Rucci v. U.S. INS, 405 F.3d 45, 49 (1st Cir. 2005) (second and fifth alterations in original) (quoting Nogueras-Cartagena v. United States, 172 F. Supp. 2d 296, 315 (D.P.R. 2001), aff'd sub nom. Nogueras-Cartagena v. U.S. Dep't of Just., 75 F. App'x 795 (1st Cir. 2003) (per curiam) (unpublished decision)).

On appeal, the parties dispute only the third element. To survive the government's summary judgment motion, Lozada-Manzano was required to raise genuine factual disputes as

to two questions: 1) whether Agent Oliva initiated or instigated the prosecution of Lozada-Manzano when the circumstances known to Agent Oliva at the time could be said to have evidenced an absence of probable cause, see Abreu-Guzmán v. Ford, 241 F.3d 69, 75-76 (1st Cir. 2001), and 2) whether Agent Oliva nevertheless pursued the prosecution with malice as defined by Puerto Rico law, see Díaz-Nieves, 858 F.3d at 688. We conclude that Lozada-Manzano has not raised a triable issue regarding malice. We need not and do not address probable cause.

**B.**

Puerto Rico law is clear that lack of probable cause and malice are "two separate elements" of a malicious prosecution claim, both of which the plaintiff must prove.[6] Díaz-Nieves, 858 F.3d at 688 (quoting Rivera-Marcano v. Normeat Royal Dane Quality, 998 F.2d 34, 37 (1st Cir. 1993)); see also Raldiris v. Levitt & Sons of P.R., Inc., 3 P.R. Offic. Trans. 1087, 1093 (1975) ("[M]alice is not presumed . . . ."). "For purposes of malicious prosecution, Puerto Rico courts equate malice with bad faith." Díaz-Nieves, 858 F.3d at 688 (quoting Paret-Ruiz v. United States,

---

[6] As explained above, because we address Lozada-Manzano's FTCA claim, Puerto Rico substantive law provides the rule of decision. See, e.g., Díaz-Nieves, 858 F.3d at 683. Lozada-Manzano does not argue that our separate circuit law regarding constitutional torts based on the Fourth Amendment, see, e.g., Hernandez-Cuevas v. Taylor, 723 F.3d 91, 99-102 (1st Cir. 2013), bears on the analysis of his malicious prosecution claim. Any such argument has been waived.

827 F.3d 167, 178 (1st Cir. 2016)). The Puerto Rico Supreme Court has emphasized that "[t]he element of malice . . . should not be confused with mere negligence, inasmuch as the characteristic of negligence is inadvertence, or an absence of an intent to injure, whereas the characteristic of malice is the improper purpose to vex, prejudice, damage, [and] injure." Id. (second alteration in original) (internal quotation marks omitted) (quoting Jiménez v. Sánchez, 60 P.R. 406, 409 (1942)). Nothing in the record supports a reasonable inference of malice on Agent Oliva's part under this standard.

Decisions of this court applying the malice standard under Puerto Rico law reinforce our conclusion. In Díaz-Nieves, for example, a malicious prosecution plaintiff who had been criminally charged in connection with a drug transaction argued that law enforcement officers had acted maliciously by failing, prior to submitting evidence to a grand jury, to compare a photograph of the plaintiff with a photograph of the participants in the drug transaction, which comparison allegedly would have shown that the plaintiff was not involved. See id. at 681, 684, 688. This court affirmed the grant of summary judgment for the government, concluding that the mere failure to conduct the comparison did not raise a triable issue of malice, especially where there was "no allegation of maliciousness." See id. at 688 & n.9. Other decisions finding no triable issue of malice

- 18 -

have noted the absence of evidence of personal animosity between investigators and malicious prosecution plaintiffs. See Barros-Villahermosa v. United States, 642 F.3d 56, 59 (1st Cir. 2011); González-Rucci v. U.S. INS, 539 F.3d 66, 69-71 (1st Cir. 2008). Here, Lozada-Manzano has offered no evidence of malice, relying only on Agent Oliva's alleged failure to place greater weight on the 911 timestamp and purported misstatements in his testimony. These alleged mistakes by Agent Oliva, like that by the investigators in Díaz-Nieves, cannot support a reasonable inference of malice.

Fatally for Lozada-Manzano's case, the record contains no evidence at all that Agent Oliva acted with malice. Indeed, the record does not even show whether Agent Oliva noticed or understood the potential significance of the timestamp on the 911 call records. Because Lozada-Manzano chose not to depose Agent Oliva during the extended discovery period, the record contains no evidence as to why the agent testified that the invasion ended at the earlier time stated in Officer Perez-Difre's supplemental report, or which documents he relied on in testifying. On such a silent record, no jury could find that the testifying agent acted with malice.

Lozada-Manzano cannot salvage his malicious prosecution claim based on the actions of the other agents involved in the criminal case. Lozada-Manzano gestures toward the collective

knowledge doctrine from other areas of law, but he does not develop any argument as to why that doctrine applies to show malice or impute bad faith between officers in a tort case under Puerto Rico law. As with Agent Oliva, Lozada-Manzano failed to depose Officer Perez-Difre. Further, he points to nothing in the record or in Puerto Rico law indicating that Officer Perez-Difre instigated or initiated the federal criminal prosecution. Cf. Negron-Rivera v. Rivera-Claudio, 204 F.3d 287, 290 (1st Cir. 2000) (explaining that, under Puerto Rico law, "[t]o furnish information to a prosecuting attorney does not by itself constitute an instigation" (alteration in original) (quoting Jiménez v. Sánchez, 76 P.R. 347, 351 (1954))). Nor can FTCA liability arise from AUSA Soto-Ortega's actions. See Yacubian, 750 F.3d at 108 (explaining that an FTCA suit cannot be based on the actions of a federal prosecutor). Lozada-Manzano also refers to prosecutors' obligations to learn of exculpatory evidence in the course of criminal proceedings, but does not explain why that duty provides a basis for holding one law enforcement agent liable in tort for the actions of another.

Lozada-Manzano has failed to raise a triable issue as to whether Agent Oliva acted with malice as defined under Puerto Rico law. Summary judgment was properly granted for the United States on the malicious prosecution claim.

We also conclude that Lozada-Manzano's remaining arguments are without merit.

Lozada-Manzano's other tort claims -- and their consortium derivatives -- were properly dismissed in 2017. Constitutional tort claims are not cognizable under the FTCA; that statute does not waive sovereign immunity for constitutional torts. Meyer, 510 U.S. at 478; Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011). As for his negligent investigation claim, Lozada-Manzano has not met his burden of pleading to show that he has a cause of action under Puerto Rico law. We decline, as we have in the past, the "invitation to speculate that the Puerto Rico Supreme Court would be receptive to such a claim." Rodriguez v. United States, 54 F.3d 41, 47 (1st Cir. 1995). We do not find any remaining intentional tort claims asserted legibly. More fundamentally, any such claims are unsupported by factual allegations that would satisfy Lozada-Manzano's pleading burden under Puerto Rico law. And we separately conclude that Lozada-Manzano's other tort claims were properly dismissed.

There was no abuse of discretion in the denial of Lozada-Manzano's motion for leave to amend the complaint. See Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 58 (1st Cir. 2006) ("We . . . will defer to the district court's [decision to deny a motion to amend] so long as the record evinces an adequate reason

for the denial.").  The proposed amended complaint added no allegations that would change the substance of Lozada-Manzano's surviving claims against the federal government.[7]

## IV.

For the foregoing reasons, we affirm.

---

[7]    Lozada-Manzano's further assertions that the United States Attorney's Office should have been disqualified and sanctioned and that the district court should have reopened discovery are undeveloped and therefore waived.  See, e.g., Finsight I LP v. Seaver, 50 F.4th 226, 236 (1st Cir. 2022) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).  And because no claims remain and there will be no further proceedings before the district court, Lozada-Manzano's request that we reassign this case to a new district judge is moot.